**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BRANDON T. KIMBRO, | **Case No.** |
| Plaintiff, | **Judge** |
| v. | **COMPLAINT AND JURY DEMAND** |
| CITY OF COLUMBUS, OHIO,<br>CHRISTOPHER C. MOSES, individually, and<br>JOHN DOE, individually, | |
| Defendants. | |

Plaintiff Brandon T. Kimbro ("Kimbro"), by and through counsel, for his Complaint against Defendants City of Columbus, Ohio ("City"), Christopher C. Moses ("Moses"), and John Doe ("Doe"), states as follows:

## INTRODUCTION

1. This case arises from the City of Columbus's response to an employee who sounded the alarm about the integrity of one of the City's most consequential employee-benefits procurements.

2. In 2024, the City was conducting RFP026722 for its Medical, Prescription Drug, COBRA, and Tobacco Cessation programs. The procurement involved hundreds of millions of dollars in public funds. UnitedHealthcare ("UHC") was the incumbent provider and had provided healthcare services to the City for more than two decades.

3. Kimbro worked in the City's Department of Human Resources as an Employee Wellness Coordinator. During the RFP process, Kimbro personally discovered on City of Columbus Employee Wellness & Benefits Manager Sonya Burley's ("Burley") shared City Outlook calendar an unusual approximately three-hour, after-hours steakhouse meeting involving Burley, UHC executive account manager Jen Bown, and the City's lead Aon benefits consultant. The meeting

was scheduled for the Friday immediately preceding finalist presentations, after competing proposals had been submitted, reviewed, and scored.

4. Kimbro immediately raised the discovery internally. He showed the calendar information to Fiscal Manager Jenny Hill, another RFP scorer, who reacted with alarm and went to Deputy Director Brooke Carnevale. Carnevale then confronted Burley. Weeks later, coworker Kelly Kordupel told Kimbro that she intended to report the matter to the Ohio Ethics Commission. Kimbro subsequently warned Moses in writing about the steakhouse meeting, the ethics complaint, and the danger of moving forward with an approximately $250 million healthcare decision while the procurement-integrity concerns remained unresolved.

5. Kimbro's warning was not hypothetical. On August 13, 2024, the City cancelled RFP026722 because of a "previously unknown potential conflict of interest of a scorer," invalidated the submissions and scoring, and announced that the RFP would be reissued. The conflict that caused the cancellation was the same conflict Kimbro had reported concerning the RFP.

6. Upon information and belief, City decisionmakers initially believed Kimbro was the employee who had made the external ethics complaint. After the City learned that Kordupel—not Kimbro—had made the complaint and that Kordupel's status as the complainant protected her from termination, the City turned its attention toward Kimbro. Three days after cancelling the RFP because of the conflict he had reported, the City opened a new investigation against him over a mammography event with low registration that the City eventually cancelled, and whether he sufficiently followed up after requesting that a City fitness facility be cleaned.

7. On October 7, 2024, less than three months after Kimbro's written ethics disclosure and less than two months after the RFP was cancelled for a potential conflict of interest, Moses summoned Kimbro to a meeting with senior Human Resources personnel. Moses told Kimbro the

City was offering him an "off ramp": resign or the City would move to fire him. The decision had already been made.

8. Kimbro resigned only because the City expressly told him that the alternative was termination. His resignation was involuntary.

9. The City later reissued the procurement. In the next competitive cycle, the City selected Anthem Blue Cross and Blue Shield instead of UHC, ending a relationship that City records describe as having lasted more than two decades.

10. Kimbro brings this action because a public employee cannot constitutionally be driven from government employment for speaking as a citizen about potential conflicts, favoritism, and integrity problems in a massive public procurement.

**PARTIES**

11. Kimbro is an adult resident of Ohio. He was employed by the City for approximately ten years and, at all relevant times in 2024, served as an Employee Wellness Coordinator in the City's Department of Human Resources.

12. Defendant City of Columbus is an Ohio municipal corporation and political subdivision. At all relevant times, it acted through its officials, employees, agents, and policymakers.

13. Defendant Christopher C. Moses was, at all relevant times, the Director of the City's Department of Human Resources. He is sued in his individual capacity. Moses was the senior Human Resources official to whom Kimbro made his July 11, 2024, disclosure and the official who personally delivered the October 7, 2024, resign-or-be-fired ultimatum.

14. Defendant John Doe is the presently unidentified City official who, upon information and belief, possessed or exercised ultimate decision-making authority with respect to Kimbro's termination and made, authorized, approved, and/or ratified the decision that Kimbro would be

terminated if he did not resign. Doe is sued in his individual capacity. Doe's identity and precise role are presently within Defendants' knowledge and will be substituted by name when ascertained.

## JURISDICTION AND VENUE

15. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16. This Court has supplemental jurisdiction over Kimbro's related Ohio-law claim under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and the events giving rise to the claims occurred in Columbus, Franklin County, Ohio, within the Eastern Division of the Southern District of Ohio.

## FACTUAL ALLEGATIONS

18. Kimbro began working for the City in 2014 as an Outreach Worker. He was promoted to Exercise Physiologist in 2015. In 2018, the City promoted him Employee Wellness Coordinator at an annual salary of approximately $62,400. He remained in that role until the events at issue.

20. Kimbro's ordinary duties concerned employee wellness programming and vendor/program administration. His ordinary job duties did not include serving as an ethics investigator, policing conflicts of interest in City procurements, investigating corruption, or reporting suspected misconduct by senior Human Resources personnel to the Human Resources Director.

21. Although Kimbro's work gave him familiarity with employee-benefits operations and vendors, his decision to report potential procurement improprieties to Moses was not a task he was employed or ordinarily expected to perform.

22. In February 2024, the City issued RFP026722 for Medical, Prescription Drug, COBRA, and Tobacco Cessation programs.

23. The procurement concerned a massive expenditure of public funds. The City later authorized up to approximately $243.874 million merely to maintain the incumbent medical and prescription-drug program for the February 2025 through January 2026 period after the 2024 RFP was cancelled.

24. UHC was the incumbent benefits provider. City records later described UHC as having served as the City's provider for more than two decades.

25. During the open RFP, Kimbro became aware of facts that caused him and other employees to question the integrity and appearance of the procurement process.

26. On the Thursday immediately before finalist presentations were scheduled to begin the following week, Kimbro was working in his office at 77 North Front Street with coworker Lauren Battista and reviewing Outlook calendar availability. Because Burley required members of her team to share calendars, Kimbro could view the details of a large and unusual approximately three-hour block on Burley's City work calendar for the following evening, after normal business hours.

27. The calendar preview showed that the invitation came from Jen Bown, an executive account manager for UHC. The invitees included Burley and the City's lead account manager from Aon, the City's employee-benefits consultant. The meeting location was a downtown Columbus steakhouse.

28. The timing immediately concerned Kimbro. The next business day after the planned steakhouse meeting began four days of finalist presentations for the City's health-insurance RFP. By then, competing proposals had been submitted, reviewed, and scored, including pricing and provider-disruption information. In Kimbro's view, an incumbent bidder obtaining after-hours

access to a lead scorer and the City's lead consultant at that stage created an obvious conflict and procurement-integrity concern.

29. Upon information and belief, once City decisionmakers learned that Kordupel—not Kimbro—was the external complainant, the perceived constraint against terminating the known complainant did not extend to Kimbro, even though he had discovered the conflict, raised it internally, and separately reported it directly to Moses.

30. Kimbro later learned from Kordupel that City personnel knew she was the employee who had made the complaint and that she had been told she was protected from termination because the City knew she was the complainant.

31. Upon information and belief, senior Human Resources personnel knew that an employee had reported the procurement conflict externally and initially suspected or believed that Kimbro was the employee who had made the ethics complaint.

32. Kimbro understood that an ethics complaint had been made concerning the same procurement conduct. After weeks passed without any meaningful update from Human Resources leadership, and while the RFP continued forward, Kimbro decided that Moses personally needed to be warned before the City advanced the healthcare recommendation.

33. Several weeks later, coworker Kelly Kordupel informed Kimbro that, after receiving guidance, she intended to send information concerning the matter to the Ohio Ethics Commission. Kordupel told Kimbro because he had discovered the calendar invitation and could become involved in any resulting inquiry.

34. Instead, finalist presentations proceeded the following week, and best-and-final offers continued to be received. Kimbro and other Benefits and Wellness employees became increasingly concerned that the procurement was proceeding despite the reported conflict.

35. Moments later, Carnevale went to Burley's office. Their closed-door discussion became animated enough to be heard, although muffled, in nearby offices. Kimbro thereafter received no indication that the procurement had been halted or that the concern had been resolved.

36. Hill then went directly to her supervisor, Deputy Director Brooke Carnevale, and reported the matter. Both Hill and Burley reported to Carnevale at that time.

37. After Kimbro explained the calendar invitation, Hill appeared visibly shaken, put her forehead in her hands, and immediately asked, "Where's Chris?"—referring to Director Moses. Kimbro told her that he had seen Moses leave for a meeting at City Hall.

38. On the Friday of the scheduled steakhouse meeting, Kimbro texted Jenny Hill, the Human Resources Department's Fiscal Manager, and asked her to come to his office so he could get her assessment of what he had discovered. Hill was herself a scoring member of the RFP committee.

39. On June 28, 2024, Carnevale initiated an investigation of Kimbro concerning the timeliness of data he had been asked to provide and the tone of email communications. The investigation focused on communications occurring between April and June 2024.

40. That investigation was conducted by Human Resources Manager Tammy Bethea. Kimbro was the only person interviewed.

41. On July 10, 2024, Moses separately forwarded Bethea another email exchange involving Kimbro and Burley for inclusion in the investigation.

42. On July 11, 2024, Kimbro sent Moses a lengthy written communication because he believed Moses needed to know what was occurring before the City advanced the healthcare procurement recommendation.

43. In the portion of the July 11 communication addressing the Medical/Pharmacy RFP, Kimbro reported that information and screenshots concerning the procurement had been sent to the Ohio Ethics Commission and a local prosecutor's office by a concerned staff member.

44. Kimbro reported concerns regarding meetings appearing on Burley's City calendar involving Burley, the consultant, and the incumbent vendor during the open RFP.

45. Kimbro specifically identified an after-hours steakhouse meeting occurring only days before finalist presentations as particularly concerning.

46. Kimbro did not purport to know that confidential RFP information had actually been exchanged. Instead, he warned Moses that even if no confidential information had been shared, the contacts created serious procurement-integrity concerns and damaging optics that could become the subject of a public-records request by a losing bidder.

47. Kimbro further warned Moses about the risk of presenting the team's approximately $250 million healthcare decision to the Mayor's Office before the concerns were addressed, particularly if ethics authorities later took issue with the meetings.

48. The subject of Kimbro's disclosure was not his compensation, schedule, personal workload, or other private employment grievance. It concerned the integrity of a public procurement involving hundreds of millions of dollars in public funds, potential conflicts or favoritism involving an incumbent vendor, and the public's interest in honest government.

49. Kimbro made the disclosure because he believed Moses, as Human Resources Director, needed to know of the procurement-integrity problem before the City moved forward.

50. Four days later, on July 15, 2024, Kimbro was interviewed in the investigation that had been opened June 28. On the same date, Moses met with the Wellness Team.

51. During that July 15 meeting, Moses took an unusual and direct interest in an August 13 mobile mammography event and told the Wellness Team that responsibility for the event rested with Wellness. Kimbro later reported that, before July 15, Moses had never taken such an interest in the event or said that Wellness would be responsible for its success.

52. On August 13, 2024, the mammography event was cancelled because of low registration.

53. Upon information and belief, also on August 13, 2024, the City cancelled RFP026722 because of the same potential conflict of interest Kimbro had discovered and reported.

54. The City's subsequent public legislative record expressly states that the RFP was cancelled because of a "previously unknown potential conflict of interest of a scorer," that all submissions and scoring were invalidated, and that the RFP would be reissued in 2025.

55. The cancellation notice was issued in Moses's name as Director of Human Resources.

56. The conflict that caused the City to invalidate the RFP was the conflict Kimbro had raised concerning the incumbent vendor's access to an RFP scorer during the active procurement. The concern Kimbro reported was therefore sufficiently serious that the City ultimately discarded the entire procurement and ordered it redone.

57. The cancellation was an extraordinary event. Because the City no longer had sufficient time to complete another RFP in 2024, it later sought and obtained authority to waive competitive bidding and extend UHC for one additional year at an authorized cost of approximately $243.874 million.

58. Three days after the RFP cancellation, on August 16, 2024, Deputy Director Alysha Martin requested another investigation of Kimbro.

59. The new investigation concerned two principal matters: the cancelled mobile mammography event and conditions at Front Street Fitness.

60. The mammography event had originally been scheduled for June 24, 2024, and had already been cancelled once for low registration. The Wellness Team did not select the original or rescheduled date. Kimbro explained that the location was poorly suited to the event and that many employees at the location were under forty.

61. Despite those limitations, Kimbro and the Wellness Team promoted the event through wellness champions, People Team communications, biometric screenings, and posters.

62. The second subject involved an anonymous complaint that Front Street Fitness needed cleaning. After learning of the complaint, Kimbro contacted City Facilities personnel and asked that the facility be deep cleaned. No additional cleaning complaints were reported.

63. The investigation faulted Kimbro because he did not later confirm that the deep cleaning had actually occurred.

64. The investigation also referenced a complaint concerning a Facilities custodial employee who wore headphones while working in a women's locker room. Kimbro had not learned of that issue until he was blind-copied on an email, and Burley herself stated that she was taking the issue to Human Resources.

65. Nevertheless, on September 16, 2024, Bethea concluded that Kimbro had committed "Insubordination" and "Neglect of Duty."

66. The City's own contemporaneous treatment of Kimbro was inconsistent with a narrative that he was a chronically troubled employee already headed for termination. The City had previously selected Kimbro to participate in an employee promotional campaign and used his image in official City Human Resources communications.

67. Indeed, on September 11, 2024—while the later investigation of Kimbro was pending and only weeks before the City forced him out—the City distributed an official Human Resources communication using a banner image featuring Kimbro. The City continues to use imagery from that employee campaign on its official employment website.

68. These contemporaneous City communications are inconsistent with the later effort to portray Kimbro's older investigations as a steadily escalating disciplinary record warranting termination.

69. The September report expressly aggregated Kimbro's prior investigative history when considering discipline, including a 2021 written reprimand, a December 2021 investigation, and the June 2024 investigation.

70. The earlier incidents had not resulted in Kimbro's termination. In the December 2021 investigation, Burley had expressly requested that Kimbro be terminated, but the investigator declined to recommend termination and instead recommended consideration of a performance-improvement plan and removal of supervisory duties.

71. The 2021 investigation resulted in a written reprimand. The December 2021 investigation recommended a performance-improvement plan and potential removal of supervisory duties. The June and August 2024 investigations did not, before the October 7 ultimatum, result in separate discipline communicated to Kimbro.

72. On October 7, 2024, Moses summoned Kimbro to a meeting attended by Moses, Bethea, and Martin.

73. Moses opened the meeting by telling Kimbro that the City was going to offer him an "off ramp."

74. The meeting was not a predisciplinary meeting at which the City was neutrally deciding what action to take. The City had already decided that Kimbro would either leave voluntarily or face termination proceedings.

75. The identity of the official with ultimate authority over that decision was not disclosed to Kimbro. Kimbro therefore pleads John Doe as the ultimate decisionmaker in the alternative to, and in addition to, Moses's direct personal participation in the retaliatory action.

76. Upon information and belief, before the October 7 meeting, Moses and John Doe had made, authorized, approved, participated in, and/or ratified the decision that Kimbro would be separated from City employment, with resignation offered only as the alternative to formal termination.

77. Kimbro asked what would happen if he refused to resign. Moses told him that the City would move to fire him, would prepare the paperwork, and would begin the termination process.

78. Kimbro was deeply disturbed by this discussion.

79. Kimbro was not provided with the investigative summaries upon which the City was relying, was not meaningfully informed that years-old investigations were being aggregated to justify termination and was not given a genuine opportunity at that meeting to persuade the decisionmakers to retain him.

80. Kimbro was told he would be sent home that day without retrieving his belongings and had to communicate his decision by the following day.

81. Faced with the express choice of resignation or termination, Kimbro submitted a resignation letter. His last working day was October 7, 2024, and the City processed his separation effective November 1, 2024.

82. The City's personnel record coded the separation as a resignation, but the resignation was not voluntary. It was submitted only after Moses told Kimbro the City would fire him if he did not resign.

83. The timing and circumstances support the inference that the City's asserted disciplinary rationale was pretextual. Kimbro discovered the conflict, caused it to be elevated within Human Resources, knew of the external ethics complaint, separately reported the matter to Moses, and was initially believed by decisionmakers to be the external complainant. After the City learned the identity of the actual complainant—who Kimbro was later told was protected from termination—the City forced Kimbro out instead.

84. Only eighty-eight days elapsed between Kimbro's July 11 written disclosure to Moses and the October 7 ultimatum delivered by Moses.

85. The official who received the protected disclosure was thus the same official who personally communicated the decision that Kimbro must resign or face termination.

86. Following the cancellation of the 2024 RFP, the City reissued the medical/pharmacy procurement in 2025 as RFP030095.

87. The City interviewed three medical-program finalists and selected Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield as the medical third-party administrator beginning in 2026.

88. The selection ended UHC's role as the City's principal healthcare provider after more than two decades, subject to runout obligations under the prior UHC contract.

89. These subsequent procurement events further underscore that the concerns Kimbro raised involved a real and consequential governmental matter, not merely an internal personality dispute.

90. Kimbro and Moses had begun their City careers at approximately the same time and had discussed on multiple occasions their progress toward Public Service Loan Forgiveness ("PSLF").

91. Moses knew that Kimbro had devoted approximately a decade to qualifying public employment and was approaching forgiveness of a substantial federal student-loan balance. After ten years of public employment, Kimbro would have had his remaining student loan balance forgiven.

92. Kimbro's federal student-aid records currently reflect 116 qualifying PSLF payments out of 120 and an outstanding federal student-loan balance of approximately $99,832.79. His loans are presently in forbearance.

93. By forcing Kimbro from qualifying City employment, Defendants interrupted his qualifying public employment and caused or contributed to delay, additional expense, and uncertainty concerning PSLF forgiveness. The amount of PSLF-related loss proximately caused by Defendants will be established through discovery and at trial.

94. As a direct and proximate result of Defendants' actions, Kimbro has suffered and continues to suffer lost wages and benefits, a substantial period of unemployment, impairment of future earnings, loss and delay of employment-related and PSLF benefits, emotional distress, humiliation, reputational injury, and other compensatory damages.

**DAMAGES AND ECONOMIC CONSEQUENCES**

95. Before the forced resignation, Kimbro was earning approximately $62,400 per year, together with City health-insurance, retirement, paid-leave, and other employment benefits.

96. After the City forced Kimbro from his employment, he was unemployed for several months, despite reasonable efforts to obtain replacement employment.

97. During that period of unemployment, Kimbro lost considerable wages and employer-provided benefits, subject to proof and mitigation at trial.

98. Kimbro obtained replacement employment with a new company.

99. Kimbro also lost or incurred additional employment-related benefits and expenses, including health-insurance coverage, retirement and pension contributions, paid time off, job-search expenses, and other consequential economic losses to be established through discovery and at trial.

100. At the time of the October 7, 2024, ultimatum, Moses knew from multiple personal conversations with Kimbro that Kimbro was nearing the 120 qualifying payments required for Public Service Loan Forgiveness and that continued qualifying public employment was economically important to him.

101. Kimbro and Moses had discussed their respective progress toward Public Service Loan Forgiveness on multiple occasions. Moses nevertheless personally delivered the resign-or-be-fired ultimatum.

102. Kimbro's current federal student-aid records show 116 qualifying PSLF payments out of 120 and approximately $99,832.79 in outstanding federal student-loan debt. Kimbro's loans are presently in forbearance.

103. Kimbro seeks recovery of the actual economic losses proximately caused by the interruption and delay of his PSLF progress, including additional loan payments, interest, delayed forgiveness, and related losses proven through discovery and at trial. Kimbro does not presently allege that the entire outstanding loan balance is automatically recoverable as damages.

104. The manner in which Kimbro was forced from a decade-long public career also caused emotional distress, anxiety, embarrassment, humiliation, loss of professional standing, and

disruption to his personal and financial life. The nature and extent of these injuries will be established through testimony and discovery.

105. Moses was not a remote participant. He personally received the protected July 11 disclosure and, eighty-eight days later, personally communicated the City's predetermined resign-or-be-fired ultimatum. Upon information and belief, John Doe was the ultimate decisionmaker who made, authorized, approved, and/or ratified that retaliatory action. Kimbro alleges that both individual Defendants acted with reckless or callous indifference to his federally protected First Amendment rights, supporting punitive damages against each individual Defendant.

**COUNT I**
**42 U.S.C. § 1983 – FIRST AMENDMENT RETALIATION**
**(Against Defendants Moses and John Doe Individually)**

106. Kimbro incorporates the preceding paragraphs as if fully rewritten herein.

107. The First Amendment protects a public employee who speaks as a citizen on a matter of public concern, subject to the applicable balancing of the employee's and public employer's interests.

108. Kimbro's July 11, 2024, disclosure addressed matters at the core of public concern: the integrity of a municipal procurement involving hundreds of millions of dollars, potential conflicts or favoritism involving an incumbent government contractor, the expenditure of public funds, and the integrity of City government.

109. The speech at issue was not itself ordinarily within the scope of Kimbro's job duties. Kimbro's work included wellness programming and certain vendor/program administration, but he was not an ethics officer, procurement-compliance officer, investigator, auditor, or official ordinarily charged with investigating or reporting suspected misconduct by senior Human Resources personnel to the Human Resources Director.

110. Kimbro therefore spoke as a citizen when he elevated the procurement-integrity concerns to Moses.

111. Kimbro's interest, and the public's interest, in exposing and preventing potential conflicts, favoritism, and impropriety in a massive public procurement outweighed any legitimate interest the City had in suppressing the disclosure.

112. Moses knew of Kimbro's protected speech because Moses personally received the July 11 communication. Upon information and belief, John Doe knew of Kimbro's protected speech and the substance of the RFP concerns before making, authorizing, approving, and/or ratifying the decision to terminate Kimbro.

113. Less than three months later, Moses personally delivered the predetermined ultimatum that Kimbro resign or the City terminate him. Upon information and belief, either Moses or John Doe made, authorized, approved, and/or ratified that ultimate employment decision.

114. An express resign-or-be-fired ultimatum and the resulting involuntary resignation constitute adverse employment action sufficient to deter a person of ordinary firmness from engaging in protected speech.

115. The temporal proximity, Moses's direct knowledge, the City's initial belief that Kimbro was the ethics complainant, its subsequent knowledge of the actual complainant's identity, Doe's participation in and/or approval of the ultimate decision, the post-disclosure investigation, the cancellation of the RFP because of the same conflict Kimbro reported, the aggregation of old incidents into a termination rationale, the weakness and subjectivity of the final allegations, and the circumstances of the October 7 meeting support the inference that Kimbro's protected speech was a substantial or motivating factor in the adverse action.

116. Absent Kimbro's protected speech concerning the RFP, Defendants would not have forced him from his employment when they did.

117. Moses and John Doe acted intentionally and with reckless or callous indifference to Kimbro's federally protected First Amendment rights. Moses personally received the protected disclosure and later personally communicated the predetermined resign-or-be-fired ultimatum; upon information and belief, Doe made, authorized, approved, and/or ratified the ultimate retaliatory employment decision.

118. At the time of the conduct at issue, clearly established law prohibited a public official from retaliating against an employee for protected citizen speech concerning governmental corruption, conflicts, favoritism, or serious governmental misconduct when the speech itself was not ordinarily within the employee's job duties.

119. By the foregoing conduct, Moses and John Doe, each acting under color of state law, deprived Kimbro of rights secured by the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

120. As a direct and proximate result, Kimbro is entitled to compensatory damages, appropriate equitable relief, punitive damages against Moses and John Doe individually, and attorney fees and costs under 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983 – MUNICIPAL LIABILITY**
**(Against Defendant City of Columbus)**

121. Kimbro incorporates the preceding paragraphs as if fully rewritten herein.

122. The constitutional deprivation alleged above was not merely the unauthorized act of a low-level employee.

123. Moses was the Director of Human Resources and the City's chief Human Resources official. He received Kimbro's protected disclosure, was directly involved in the events that followed, and personally communicated the City's final decision that Kimbro must resign or face termination proceedings.

124. Upon information and belief, the decision to force Kimbro's resignation was made, authorized, approved, and/or ratified before the October 7 meeting by Moses, John Doe, and/or another City official possessing final authority with respect to the employment action at issue.

125. The identities and respective roles of all City officials who participated in, authorized, approved, or ratified the October 7 decision are peculiarly within Defendants' knowledge and will be established through discovery. Kimbro pleads final-policymaker, delegated-authority, and ratification theories in the alternative.

126. Upon information and belief, Moses and/or John Doe possessed final policymaking authority for the relevant personnel decision, acted pursuant to authority delegated by a final policymaker, and/or the final policymaker knowingly approved and ratified the decision and its basis.

127. Alternatively, to the extent John Doe or another official rather than Moses possessed final policymaking authority, that official approved or ratified the decision to force Kimbro's resignation after having knowledge of the material facts surrounding the decision.

128. The October 7 meeting communicated an already-made City decision. Kimbro was not told that the City was merely recommending discipline for later neutral consideration; he was told to take the "off ramp" and resign or the City would proceed to fire him.

129. The decision of the City's final policymaker, and/or the affirmative ratification of the retaliatory decision by the final policymaker, constituted official municipal policy for purposes of 42 U.S.C. § 1983.

130. That official decision was the moving force behind the deprivation of Kimbro's First Amendment rights and his resulting damages.

131. Accordingly, the City is liable under 42 U.S.C. § 1983 for the constitutional deprivation caused by its official decision, policy, authorization, and/or ratification.

132. As a direct and proximate result, Kimbro is entitled to compensatory damages, appropriate equitable relief, and attorney fees and costs under 42 U.S.C. § 1988.

**COUNT III**
**WRONGFUL DISCHARGE IN VIOLATION OF OHIO PUBLIC POLICY**
**(Against Defendant City of Columbus)**

133. Kimbro incorporates the preceding paragraphs as if fully rewritten herein.

134. Ohio has clear and substantial public policies favoring honest government, integrity in public contracting, the proper stewardship of public resources, and the disclosure and correction of conflicts, favoritism, and misuse affecting public contracts and public funds.

135. Those policies are reflected, among other sources, in Ohio's ethics and public-contract laws, including R.C. Chapter 102 and R.C. 2921.42, and in Ohio law protecting the reporting of violations and misuse of public resources.

136. Kimbro reasonably raised concerns implicating those public policies when he reported potential conflicts, improper vendor contacts, and procurement-integrity problems in a City healthcare RFP involving hundreds of millions of dollars in public funds.

137. Kimbro need not prove that the suspected conduct ultimately resulted in a criminal conviction or formal ethics adjudication to establish that his discharge for raising the concerns jeopardized the identified public policies.

138. Permitting a political subdivision to force an employee from public service because he raised good-faith concerns about conflicts or favoritism in a massive public procurement would jeopardize the identified public policies by deterring employees from exposing such conduct.

139. The City forced Kimbro to resign because of, and in retaliation for, his disclosure concerning the RFP and the scrutiny and embarrassment that followed.

140. The reasons advanced for removing Kimbro were pretextual and were assembled or invoked to provide a purported disciplinary justification for a decision motivated by his procurement disclosure.

141. The City lacked an overriding legitimate business justification for forcing Kimbro from his employment when it did.

142. Kimbro's involuntary resignation therefore constitutes a wrongful and/or constructive discharge in violation of Ohio public policy.

143. R.C. Chapter 2744 does not bar this employment-related claim against the City because the action arises out of the employment relationship within the exception stated in R.C. 2744.09.

144. As a direct and proximate result of the City's wrongful conduct, Kimbro has suffered compensatory damages, including lost wages and benefits, impairment of future earnings, loss and delay of PSLF-related benefits, emotional distress, humiliation, reputational injury, and other damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon T. Kimbro respectfully requests judgment in his favor and against Defendants, jointly and severally to the extent permitted by law, and requests:

A. Compensatory damages in an amount to be determined at trial, including wages and benefits lost during Kimbro's period of unemployment, any continuing wage or benefit differential, back pay, front pay where appropriate, retirement and insurance losses, actual economic losses associated with interruption or delay of PSLF eligibility, emotional-distress damages, reputational damages, and other consequential damages proven at trial;

B. Appropriate equitable and declaratory relief, including reinstatement if appropriate or front pay in lieu thereof;

C. Punitive damages against Defendants Moses and John Doe in their individual capacities in an amount sufficient to punish and deter the unconstitutional conduct;

D. Prejudgment and post-judgment interest as allowed by law;

E. Reasonable attorney fees and costs under 42 U.S.C. § 1988 and any other applicable authority; and

F. Such other legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**HASTIE LAW OFFICE, LLC**

*/s/ Edward Hastie*

Edward W. Hastie III (0079438)
*Trial Attorney*
Hastie Law Office, LLC
1299 Virginia Ave.
Columbus, OH 43212
Office: 614-488-2800
Cell: 614-940-5003
Fax: 614-488-2882
ed@hastielegal.com

**LALIBERTE LLC**

*/s/ Brian J. Laliberte*

Brian J. Laliberte (0071125)
1299 Virginia Avenue – Suite B
Columbus, OH 43212
T. 614.284.7171
E. Brian@LawyerCollective.com

Attorneys for Plaintiff Brandon T. Kimbro